IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

JUL 1 8 2014

PER _____
DEPUTY CLERK

PAULETTE JOHNSON,            :

       Plaintiff,            :

v.                           :          3:12-CV-01596

CAROLYN W. COLVIN, ACTING    :          (JUDGE MARIANI)
COMMISSIONER OF SOCIAL
SECURITY,                    :

       Defendant.            :

## MEMORANDUM

### Introduction

Plaintiff Paulette Johnson has filed this action seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Johnson's claim for social

security disability insurance benefits.

Johnson protectively filed her application for disability insurance benefits on April 17,

2007, claiming that she became disabled on January 4, 2005. Tr. 72, 73. Johnson has

been diagnosed with numerous impairments, including: obesity, "right shoulder

impingement/tendinopathy/bursitis," lumbar degenerative disc disease, lumbar degenerative

joint disease, left foot reflex sympathetic dystrophy, arthrodesis of the left foot, lower

extremity radiculopathy, bilateral sural sensory polyneuropathy, lumbar disc herniations,

lumbar spinal stenosis, diabetes, hypertension, and dysthymic disorder. Tr. 343, 1176-77.

On June 18, 2007, Johnson's application was initially denied by the Bureau of Disability Determination. Tr. 53.

A hearing was conducted by an administrative law judge ("ALJ") on March 21, 2011, where Johnson was represented by counsel. Tr. 424-66.[1]  On April 27, 2011, the ALJ issued a decision denying Johnson's application. Tr. 1173-89. On June 21, 2012, the Appeals Council declined to grant review. Tr. 393. Johnson filed a complaint before this Court on August 15, 2012. Supporting and opposing briefs were submitted and this case became ripe for disposition on April 8, 2013, when Johnson decline to file a reply brief.

Johnson appeals the ALJ's determination on four grounds: (1) the ALJ erred in finding that Johnson did not meet or equal a listing at step three, (2) the ALJ improperly discounted Johnson's credibility and testimony, (3) the ALJ improperly weighed the competing medical opinions, and (4) the residual functional capacity determination was not supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is affirmed.

**Statement of Relevant Facts**

Johnson is 48 years of age, has a high school education, and is able to read, write, and understand the English language. Tr. 94, 426-27. Johnson's past relevant work

---

[1] This was the second administrative hearing held in this case. The first hearing was held on October 9, 2008, resulting in a denial of Johnson's application. Tr. 10-18, 21-50. Thereafter, Johnson filed suit in federal court; by order dated February 8, 2011, the case was remanded to the Commissioner for further proceedings. Tr. 482.

includes work as a waitress, which is classified as light, semi-skilled work, and work in a grocery store bakery, which is medium, semi-skilled work. Tr. 460.

## A.    Johnson's Physical Impairments

Johnson first injured her foot on January 4, 2005 when she slipped and fell while at work. Tr. 33. Thereafter, Johnson presented to her primary care physician, Vaghenag Tarpinian, M.D., complaining of left knee, leg, and foot pain. Tr. 224-25. On March 31, 2005, an x-ray of Johnson's left foot revealed mild degenerative changes, but no fractures or other issues. Tr. 228. Johnson's pain continued to worsen throughout the year, and an MRI eventually revealed a Lisfranc fracture in Johnson's left foot. Tr. 140. On January 11, 2006 James Loomis, D.P.M. successfully performed left metatarsal joint fusion surgery on Johnson's left foot. Tr. 142-44. Subsequent follow-up appointments with Dr. Loomis revealed that, despite the surgery, Johnson's left foot pain did not abate. Tr. 137-39.

After Johnson's left foot surgery, she began experiencing right shoulder and arm pain due to her use of crutches. Tr. 174, 177. An August 25, 2006 MRI of her right shoulder revealed slight degenerative changes at the acromioclavicular joint, "subtle" subdeltoid bursitis,[2] and suggestions of tendinopathy in the supraspinatus tendon. Tr. 205. On March 1, 2007, Mikhail Artamonov, M.D., examined Johnson to provide a second

_____

[2] Bursitis "is a painful condition that affects the small fluid-filled pads — called bursae (bur-SEE) — that act as cushions among your bones and the tendons and muscles near your joints. Bursitis occurs when bursae become inflamed . . . Treatment typically involves resting the affected joint and protecting it from further trauma. In most cases, bursitis pain goes away within a few weeks with proper treatment, but recurrent flare-ups of bursitis are common." Mayoclinic.com, Bursitis Definition, _available at_ http://www.mayoclinic.org/diseases-conditions/bursitis/basics/definition/con-20015102 (last visited July 7, 2014).

opinion regarding her neck, right shoulder, and upper extremity pain. Tr. 235-37. Dr. Artamonov noted signs of impingement in Johnson's right shoulder. Tr. 236. Although Johnson had a painful arch, she had a full abduction and adduction range of motion, and all stress tests were negative. *Id.* Dr. Artamonov noted some elements of pain exaggeration, although he also believed that Johnson had a "[s]evere functional disability." Tr. 237. At Dr. Artamonov's request, another MRI was performed on Johnson's right shoulder. Tr. 234. This MRI revealed a likely partial tear of the infraspinatus tendon, hypertrophy of the acromioclavicular joint, and possible tendinitis of the supraspinatus tendon. *Id.*

By January 2007 Johnson's left foot pain still had not abated, and she presented to Stephen Brigido, D.P.M. for a pain management consultation. Tr. 253. X-rays revealed that Johnson's prior fusion surgery had failed and additional surgery would be required. *Id.* On March 22, 2007, Dr. Brigido performed left foot first metatarsal medial cuneiform fusion surgery and second metatarsal intermediate cuneiform fusion surgery. Tr. 147-48, 276-80. Pins were inserted into Johnson's foot to fuse the bones, and an external fixator was placed on Johnson's foot. Tr. 147-48. A post-operative examination revealed satisfactory alignment of the left foot and ankle. Tr. 151, 156. Later examinations revealed that Johnson initially was doing well and had minimal amounts of pain; her foot had healed in "excellent anatomic position." Tr. 247, 249. The external fixator was removed on April 24, 2007, and no complications from the surgery were noted. Tr. 244, 275.

On May 4, 2007, Johnson returned to Dr. Artamonov complaining of continuing right shoulder pain. Tr. 238. Dr. Artamonov noted a limited range of motion in Johnson's right shoulder, but otherwise Johnson did not have any new complaints. *Id.* At Johnson's final appointment with Dr. Artamonov on June 28, 2007, she reported that she was no longer using crutches. Tr. 356. Dr. Artamonov observed that Johnson was experiencing "significant improvement of [her] bilateral shoulder pain, which obviously was related to nonweightbearing of the lower extremities." *Id.*

On February 4, 2008, Johnson slipped on ice and fell, resulted in low back pain. Tr. 319. Johnson visited the Pocono Medical Center emergency room, where x-rays of her left foot and lumbar spine showed "no acute findings." Tr. 700. Johnson denied any shoulder pain or inability to ambulate or bear weight; she denied ankle pain and denied any pain while walking. Tr. 693. The emergency room staff observed that Johnson ambulated normally and without assistance. *Id.* Johnson had no back tenderness, no calf tenderness, and no cyanosis, clubbing, or edema. Tr. 695.

An MRI of Johnson's lumbar spine was conducted on February 14, 2008. Tr. 343. This MRI revealed disc herniation at the L3-4, L4-5, and L5-S1 levels, resulting in impingement of the thecal sac and "possible" compression of the L5 and right S1 nerve roots. *Id.* The MRI also revealed spinal stenosis from the L3 to the S1 vertebrae and bilateral narrowing of the neural foramina at the L3-4, L4-5, and L5-S1 levels. *Id.* However, there was no evidence of spinal cord compression. *Id.* Based on this MRI, Dr. Tarpinian

diagnosed Johnson with lumbar radiculopathy. Tr. 316. On February 28, 2008, Johnson

presented to Ajay Kumar, M.D, complaining that the pain in her low back had worsened and

spread to her left foot. Tr. 359. Johnson had marked tenderness bilaterally at her L4, L5,

ad S1 facets, and had a positive straight leg test on the left side. Id. Dr. Kumar

recommended physical therapy to treat Johnson's pain, but Johnson refused physical

therapy because it was "not practical for her." Id.

On March 8, 2008, Johnson returned to the Pocono Medical Center emergency

room. Tr. 705. She was not experiencing any joint or back pain, had no CVA tenderness,

no back tenderness to palpation, and a physical inspection of her back was normal. Tr.

709. Johnson's extremities were all normal to inspection; she had no calf tenderness, and

no cyanosis, clubbing, or edema. Id. On May 6, 2008, Johnson visited the emergency

room with a puncture wound to her left foot; the on-call physician noted that Johnson had a

full range of motion and normal gait. Tr. 734, 738.

On July 11, 2008, Johnson was examined by Raymond McCarroll, C.P.M. Tr. 652.

X-rays demonstrated "solid fusion" in the left foot, and no evidence of hardware failure. Id.

There was no evidence of swelling, although there was tenderness to palpation over the

Lisfranc complex. Tr. 653. On August 13, 2008, Dr. Brigido also noted tenderness over

Johnson's Lisfranc complex, but likewise found no swelling or effusion of the foot or ankle.

Tr. 650. At this appointment, Johnson had normal sensation in her left foot and

demonstrated a "well maintained" range of motion that was "within normal limits." Id.

Johnson reported that she was using Litoderm patches on her left foot and they were "helping." Tr. 649.

On November 17, 2008, Johnson presented to Raif Van Der Sluis, M.D. for a neurological evaluation. Tr. 676-78. Johnson had mild pain at the L4 and L5 facets, but had a negative straight leg test and 5/5 strength throughout. Tr. 677. Her pin sensation was decreased by one-third in her lower legs, and she had "almost complete loss of sensation in the left medial foot." Id. Dr. Van Der Sluis diagnosed Johnson with distal sensory polyneuropathy, restless leg syndrome, possible lower lumbar radiculopathy, and radiculopathy at the C5-6 level of the spine. Tr. 678. A January 2009 EMG of Johnson's lower extremities revealed bilateral sensory neuropathy.[3] Tr. 680. On February 27, 2009, Johnson returned to Dr. Van Der Sluis for a follow-up appointment. Tr. 674-75. Johnson was not on any medications at that time, although she reported that she had found Lidocaine helpful in the past. Tr. 674. Dr. Van Der Sluis prescribed Dilaudid while noting that Johnson had "been on Dilaudid in the past, which was well tolerated, effective, and did not appear to cause sedation." Id.

On March 9, 2009, Johnson was examined by Kirit Kothari, M.D. Tr. 373-74. Johnson complained of pain, swelling, and cramping in her left foot and leg. Id. Dr. Kothari

---

[3] "Neuropathy is a collection of disorders that occurs when nerves of the peripheral nervous system (the part of the nervous system outside of the brain and spinal cord) are damaged . . . Neuropathy usually causes pain and numbness in the hands and feet. It can result from traumatic injuries, infections, metabolic disorders, and exposure to toxins . . . There is no specific length of time that the pain exists, but symptoms often improve with time—especially if the neuropathy has an underlying condition that can be cured." Gunder v. Astrue, 4:11-CV-00300, 2012 WL 511936, at n. 5 (M.D. Pa. Feb. 15, 2012).

7

diagnosed Johnson with reflex sympathetic dystrophy[4] in her lower extremities, restless leg syndrome, and lower extremity radiculopathy. Tr. 364, 374. EMG and nerve conduction tests were performed on June 16, 2009; these tests confirmed that Johnson suffered from bilateral lower extremity radiculopathy. Tr. 361. On July 7, 2009, Dr. Kothari completed a worker's compensation form on behalf of Johnson. Tr. 778. Dr. Kothari opined that Johnson was temporarily disabled; this disability began on March 19, 2009 and Dr. Kothari expected the disability to last until September 1, 2009. *Id.*

Further x-rays were taken of Johnson's left foot on November 6, 2009; these x-rays revealed no fractures, no dislocations, and no degenerative changes to the foot. Tr. 991. On September 29, 2010 a final CT scan was performed on Johnson's left foot. Tr. 1159. The alignment of Johnson's Lisfranc joint was "nearly anatomic." *Id.* Two bone fragments were discovered along with some bone spurs, although there was no tendon impingement and no "significant evidence of tendinopathy." *Id.*

### B. Medical Evaluations

On June 15, 2007, Mark Bohn, M.D. completed a residual functional capacity assessment. Tr. 282-87. Dr. Bohn opined that Johnson was able to lift and carry up to fifty pounds occasionally and up to twenty-five pounds frequently. Tr. 282. He believed that

---

[4] Reflex sympathetic dystrophy, more commonly known as complex regional pain syndrome ("CRPS"), "is a chronic pain condition. The key symptom of CRPS is continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time." National Institute of Neurological Disorders and Stroke, Complex Regional Pain Syndrome Information Page, *available at* http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited July 7, 2014). There is no cure for CRPS. *Id.*

Johnson should avoid concentrated exposure to extreme temperatures, wetness, humidity, airborne irritants, and hazards. Tr. 283. Otherwise, Dr. Bohn did not believe that any physical limitations were established by the medical evidence. Tr. 282-83.

On May 2, 2008, Kenneth Gentilazza, M.D. completed an impairment rating evaluation for Johnson's foot injury; no other impairments were considered. Tr. 1044-49. Based on Johnson's history, medical records, a diagnostic test review, and a physical evaluation, Dr. Gentilazza opined that Johnson had likely reached her maximum medical improvement. Tr. 1048. Dr. Gentilazza concluded that, as a whole, Johnson's left foot injury impaired her abilities by eighteen percent. *Id.*

On November 5, 2009, Thomas DiBenedetto, M.D., completed an independent medical examination of Johnson. Tr. 1001-05. At that examination, Johnson stated that she had pain and swelling in her foot, but "her back really [did] not hurt . . ." Tr. 1002. Dr. DiBenedetto noted that Johnson was experiencing some swelling in her left foot and had a decreased range of motion in her left toes, although she had good inversion and eversion. *Id.* Johnson's back was not tender, she had no paraspinal spasms, had normal reflexes, a full range of motion in her back, and a negative straight test leg. *Id.* Johnson had decreased left foot strength, but no pain to light touch in her left foot. *Id.* Based on a review of Johnson's medical records and diagnostic tests, as well as the physical examination, Dr. DiBenedetto opined that Johnson was not suffering from reflex sympathetic dystrophy. Tr. 1004. Dr. DiBenedetto stated that none of the "hallmark physical findings" associated with

9

reflex sympathetic dystrophy were present; there was no pain to light touch, no discoloration of the skin, no bony edema, no myalgia, and no muscle pain. *Id.*

Dr. DiBenedetto did not believe that Johnson was suffering from "any aggravation of low back pain," and believed that she had reached maximum medical improvement for her left foot injury. *Id.* Dr. DiBenedetto stated that there was no evidence of radiculopathy. *Id.* Dr. DiBenedetto opined that Johnson's current medical regimen was neither reasonable nor medically necessary, and believed Johnson only required over-the-counter anti-inflammatory medicine for her foot injury. Tr. 1005. He further opined that Johnson was capable of performing sedentary to light work, provided that most of her time was spent sitting down rather than standing or walking. *Id.*

On March 2, 2010, Donald Henderson, M.D. conducted a physical examination of Johnson. Tr. 1112-15. Dr. Henderson did not find any joint pain or swelling, and noted that Johnson had a full range of motion except for her left foot, where motion was decreased by fifty percent. Tr. 1113-14. Dr. Henderson observed that Johnson walked with a slight limp, but did not use a cane or walker. Tr. 1114.

On April 7, 2010, Mary Ryczak, M.D. completed an updated physical residual functional capacity assessment. Tr. 1143-48. Dr. Ryczak opined that Johnson was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently. Tr. 1143. Johnson was limited in her ability to push or pull with her lower left extremity. *Id.* Dr. Ryczak believed that Johnson could never climb ladders, ropes, or scaffolds, but could

10

occasionally use ramps and stairs, balance, stoop, kneel, crouch, or crawl. Tr. 1144. Dr.
Ryczak further opined that Johnson should avoid concentrated exposure to extreme cold
and airborne irritants. *Id.*

On March 15, 2011, Robert Mauthe, M.D. performed a physical examination of
Johnson. Tr. 588-92. Dr. Mauthe found that Johnson had a slightly limited range of motion
in her neck, a slightly painful range of motion in her left arm, and a decreased range of
motion in her flexion lumbar spine. Tr. 591. Dr. Mauthe observed significant atrophy in
Johnson's right leg and trophic changes in the left lower extremity. *Id.* Johnson was
diagnosed with right shoulder impingement syndrome, chronic back pain, diabetes, high
blood pressure, and peripheral neuropathy. Tr. 591-92. Dr. Mauthe opined that these
diagnoses, in combination with Johnson's subjective complaints and medications, would
"preclude her ability to participate in regular and sustained gainful employment . . ." Tr. 592.

## C.    The Administrative Hearing

On March 21, 2011, Johnson's second administrative hearing was conducted. Tr.
424-66.[5] At that hearing, Johnson testified that she was able to care for her personal needs
and shop, but generally was unable to perform any household chores other than occasional
cooking. Tr. 429-30. Johnson stated that, when she went shopping, she needed someone
to accompany her and push the shopping cart when it became too heavy for her to push.
Tr. 452. Johnson watched television, but did not read and had no hobbies. Tr. 430.

---

[5] The testimony offered by Johnson in the first hearing is substantially similar to the testimony
offered at the second hearing; therefore that testimony is not discussed here.

11

Johnson testified that, at one point in 2009, she had attempted working part-time at K-mart, but her pain had forced her to quit that job. Tr. 454.

Johnson testified that she only slept for approximately three hours per night due to pain in her back, left foot, and right shoulder. Tr. 432. She was only able to stand for ten to fifteen minutes before she needed to sit; Johnson could only walk for short distances before she started to hurt, and was not able to ambulate for a block on uneven surfaces because of her pain. Tr. 432, 445. Johnson also stated that she could only sit for thirty minutes before she had to stand or walk to alleviate her pain. Tr. 432. While Johnson testified that her medications "help" manage her pain, they also made her dizzy and drowsy. Tr. 433. Johnson also used a TENS unit on her foot to alleviate some of her pain. *Id.* Despite these treatments, Johnson stated that, on a scale from one to ten, the pain in her left foot was generally a nine. Tr. 434, 446. Johnson further testified that the pain in her right shoulder was generally an eight on a scale from one to ten. Tr. 436. Due to her pain, Johnson would lay down for most of the day or elevate her foot to prevent pain and swelling. Tr. 439, 455.

After Johnson testified, Josephine Dougherty, an impartial vocational expert, was called to give testimony. Tr. 460. The ALJ asked Ms. Dougherty to assume a hypothetical individual with Johnson's age, education, and work experience who could perform light work. [6] Tr. 461. The ALJ limited this individual's ability to push or pull with her upper right

---

[6] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of

and lower left extremities, and limited the individual to only occasional climbing, balancing,

or stooping, although she could never climb on ladders. Tr. 461-62. The hypothetical

individual could never kneel, crouch, or crawl, and was limited in her bilateral overhead

reach ability. Tr. 462. Furthermore, the ALJ asked Ms. Dougherty to assume that the

individual would need to avoid hazards, humidity, vibrations, and temperature extremes. *Id.*

Finally, the ALJ limited this hypothetical individual to unskilled work. *Id.*

Ms. Dougherty opined that, given these hypothetical restrictions, the individual would

not be capable of performing any of Johnson's past relevant work. *Id.* However, this

individual would be capable of performing three other jobs that exist in significant numbers

in the national economy: a digital processor, a ticket taker, and a records storage

technician. Tr. 461-62. The ALJ then modified the hypothetical question to limit the

individual to sedentary work,[7] with all other restrictions remaining. Tr. 463. Under this

scenario, Ms. Dougherty testified that the hypothetical individual would be unable to perform

any of Johnson's past relevant work, but could still work as a document preparer, a charge

account clerk, or in pharmaceutical assembly. *Id.*

---

performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

[7] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir.

2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

      The Commissioner utilizes a five-step process in evaluating disability insurance

claims. *See*, 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d

Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a

claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe

or a combination of impairments that is severe, (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment, (4) has the

residual functional capacity to return to his or her past work and (5) if not, whether he or she

can perform other work in the national economy. *See* 20 C.F.R. § 404.1520. The initial

burden to prove disability and inability to engage in past relevant work rests on the claimant;

if the claimant meets this burden, the burden then shifts to the Commissioner to show that a

job or jobs exist in the national economy that a person with the claimant's abilities, age,

education, and work experience can perform. *Mason*, 994 F.2d at 1064.

### A.    Step Three of the Sequential Evaluation Process

      Johnson first argues that the ALJ erred in finding that Johnson did not meet or equal

a listing at step three of the sequential evaluation process. Specifically, Johnson argues

that she met or equaled listings 1.04 and 1.08.

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Id.*, quoting *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990) (emphasis in original). The claimant "bears the burden of presenting medical findings showing that her impairment meets or equals a listed impairment." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000). The standard for meeting a listed impairment is higher than the standard for proving disability at steps four and five. *See Sullivan*, 493 U.S. at 532.

    i.    *Listing 1.04*

Under listing 1.04, an individual is presumptively disabled if she suffers from a disorder of the spine that results in the compromise of a nerve root or the spinal cord. 20 C.F.R. pt. 404, subpt. P, app. 1, §1.04. Additionally, the claimant must show that this disorder results in either: (A) nerve root compression "characterized by neuro-anatomic distribution of pain, limitations of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and . . . positive straight-leg test;" or (B) spinal arachnoiditis,[8]

---

[8] "Arachnoiditis describes a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord." National Institute of Neurological Disorders and Stroke, Arachnoiditis Information Page, *available at* http://www.ninds.nih.gov/disorders/arachnoiditis/arachnoiditis.htm (last visited July 8, 2014).

confirmed by appropriate medical tests; or (C) lumbar spinal stenosis resulting in

pseudoclaudication,[9] manifested by chronic nonradicular pain and weakness, and resulting

in inability to ambulate effectively.[10]  *Id.*

The ALJ's decision that Johnson did not meet or equal listing 1.04 was supported by

substantial evidence.  Johnson did not sustain her burden of proving that her spine

impairment resulted in the compromise of a nerve root or the spinal cord.  There was no

evidence in the record of any spinal cord compromise; an x-ray of Johnson's lumbar spine

revealed "no acute findings" and an MRI revealed no evidence of spinal cord compression.

Tr. 343, 700.  The only suggestion of any nerve root compromise came from a February

2008 MRI of Johnson's lumbar spine.  Tr. 343.  This MRI revealed a disc herniation at the

L5-S1 level with "possible" compression of nerve roots.  *Id.*  This was not a definitive

diagnosis that is required to meet the stringent requirements of a step three listing.

Additionally, Johnson did not sustain her burden of proof under any of the three

subparts to listing 1.04.  The medical records do not establish any motor loss as required

under subsection A.  *See*, 20 C.F.R. pt. 404, subpt. P, app. 1, §1.04(A).  No medically

acceptable tests reveal any spinal arachnoiditis as required by subsection B.  *Id.* at

---

[9] "Pseudoclaudication refers to painful cramps in the buttocks, legs and feet while walking or standing, caused by spinal, neurological or orthopedic disorders, including spinal stenosis."  *Petrowsky v. Astrue*, CIV. 10-563-SLR, 2011 WL 6083117, at *12 (D. Del. Dec. 6, 2011), quoting *Talmage v. Astrue*, Civ. No. 09–1065, 2010 WL 680461, at *12 (W.D. Pa. 2010).

[10] "Inability to ambulate effectively means an extreme limitation of the ability to walk . . . Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, §1.00 (B)(2)(b).

§1.04(B). Under subsection C, while Johnson does suffer from spinal stenosis, she has never been diagnosed with pseudoclaudication. *Id.* at §1.04(C). Johnson did not demonstrate that her impairment met all of the specified medical criteria for listing 1.04 and, consequently, the ALJ's determination is supported by substantial evidence.

    ii.    *Listing 1.08*

Listing 1.08 requires a soft tissue injury "of an upper or lower extremity, trunk, or face and head, under continuing surgical management[11] . . . directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset." 20 C.F.R. pt. 404, subpt. P, app. 1, §1.08. Johnson has not identified, and the medical records do not reveal, any soft tissue injury to any part of her body. The only surgery that Johnson has undergone was directed towards the fractures in her foot, not towards a soft tissue injury. The last surgery on her foot was in 2007, over four years prior to the administrative hearing and the ALJ's decision. Tr. 147-48, 276-80. Thus, Johnson's injury was neither a soft tissue injury, nor was it under continuing surgical management. Therefore, the ALJ's determination that Johnson did not meet or medically equal listing 1.08 was supported by substantial evidence.

---

[11] Continuing surgical management "refers to surgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments that delay the individual's attainment of maximum benefit from therapy." 20 C.F.R. pt. 404, subpt. P, app. 1, §1.00(M).

## B.    Evaluation of Johnson's Credibility

At step four, the ALJ found that Johnson's statements regarding the intensity, persistence, and limiting effects of her impairments were not entirely credible. Tr. 1181. After dedicating nearly seven pages to an evaluation of Johnson's medical records, the ALJ concluded that the evidence of record "simply does not support the claimant's alleged level of incapacity." Tr. 1181-87. An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

The ALJ addressed Johnson's subjective complaints, but concluded that, while her testimony was "supported somewhat by the objective evidence of record," the medical evidence did not support the level of limiting effects alleged by Johnson. Tr. 1187. In reaching this conclusion, the ALJ thoroughly reviewed and addressed all of the medical evidence contained within the administrative record. Tr. 1181-87.

In regards to Johnson's left foot impairment, the ALJ noted that, at a May 2007 appointment with Dr. Brigido, Johnson denied any pain or tenderness in her foot and stated that she was comfortable and doing well. Tr. 1182. The ALJ cited diagnostic images from 2008 and 2009 that showed the foot was in good alignment and was without fractures or dislocations. *Id.* The ALJ also believed that Johnson's conservative post-surgery treatment undermined her allegations of pain and physical limitations. Tr. 1183. The ALJ found it significant that Dr. Artamonov observed "elements of pain exaggeration" during his 2007

19

examination of Johnson. *Id.* The ALJ noted that in February 2009, Johnson reported that she was not on any pain medication. Tr. 1184. The ALJ cited the lack of any inpatient hospitalization and absence of frequent emergency room visits as further evidence that Johnson may have been exaggerating the symptoms of her foot impairment. *Id.*

Regarding Johnson's lumbar spine impairments, the ALJ did cite to Johnson's 2008 MRI scans and subsequent diagnoses. Tr. 1182. However, the ALJ noted that during Johnson's emergency room visits in 2008, examinations of her back were normal. Tr. 1183. Dr. Kothari's findings indicated a normal range of motion, stability, strength, and tenderness. Tr. 1184. The ALJ noted that no surgery had ever been recommended for Johnson's lumbar impairments. Tr. 1185. The ALJ also references the examination conducted by Dr. DiBenedetto. Tr. 1184. At this examination, Johnson told Dr. DiBenedetto that "her back really [did] not hurt . . ." Tr. 1002.

These medical records and objective findings are sufficient to support the ALJ's determination that Johnson's testimony was less than credible. The ALJ cited to substantial evidence that tended to undermine Johnson's testimony and, given the deference that is accorded to an ALJ's credibility determination, the ALJ's findings are supported by substantial evidence.

## C. The ALJ's Evaluation of the Relevant Medical Opinions

The preference for the treating physician's opinion has been recognized by the Third Circuit and by all of the federal circuits. *See, e.g., Morales v. Apfel*, 225 F.3d 310, 316-18

(3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." *Id.* In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. *Id.* However, "[o]pinions on some issues, such as [a statement that the claimant is disabled], are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner . . ." 20 C.F.R. § 404.1527(d). The Commissioner is not required to give any "special significance to the source of an opinion on" whether an individual is able to work. *Id.*

The ALJ gave little weight to the opinion of Dr. Mauthe that Johnson was disabled. Tr. 1186. The ALJ rejected Dr. Mauthe's opinion on the basis that it: (1) was based on a one-time examination, (2) relied heavily upon Johnson's subjective complaints, (3) contained "minimal" examination findings, and (4) was inconsistent with the medical evidence contained in the administrative record. *Id.* The ALJ then provided numerous examples where Dr. Mauthe's conclusions were directly contradicted by other medical evidence. Dr. Mauthe's findings relating to Johnson's foot were contradicted by Dr. DiBenedetto's physical examination which revealed no temperature changes, no color changes, and no edema. *Id.* Dr. Mauthe's findings were also contradicted by Dr. Gentilezza's physical examination which found no temperature changes or edema, and only

a slight degree of allodynia. *Id.* Dr. Henderson likewise found no cyanosis, no clubbing, no edema, and no deformity in any of the extremities. *Id.* Finally, the ALJ noted that determinations of disability are reserved for the Commissioner. *Id.*

The ALJ also gave little weight to the worker's compensation form completed by Dr. Kothari, wherein Dr. Kothari opined that Johnson was temporarily disabled. Tr. 1187. The ALJ found that the weight of Dr. Kothari's opinion was significantly diminished by the fact that: (1) he provided no diagnosis in the form, (2) he included no objective findings to support his conclusion, and (3) Dr. Kothari's own treatment records did not contain any adverse objective findings that would support such a conclusion. *Id.* The ALJ reiterated that determinations of disability are reserved exclusively for the Commissioner. *Id.*

The findings of Drs. Mauthe and Kothari were contradicted by the findings and opinion of Dr. DiBenedetto, an opinion that the ALJ accorded great weight. Tr. 1185-86. Dr. DiBenedetto conducted a physical examination, reviewed medical records, and reviewed previous diagnostic tests in forming his conclusion. Tr. 1002-04. Dr. DiBenedetto did not believe that Johnson was suffering from any low back pain and, notably, Johnson herself stated that her back "really [did] not hurt . . ." Tr. 1002. The doctor did believe that Johnson suffered from a serious foot injury that would require permanent work restrictions. Tr. 1004. However, Dr. DiBenedetto opined that, despite her injuries, Johnson was still able to work at a sedentary to light exertional level. Tr. 1005.

As an initial matter, the ALJ gave little weight only to the portions of Dr. Mauthe's and

Dr. Kothari's opinions that concluded Johnson was disabled. Tr. 1186-87. The ALJ was not required to give any special weight to these portions of the opinions as such determinations are reserved exclusively for the Commissioner. *See*, 20 C.F.R. § 404.1527(d). Additionally, having been presented with conflicting opinions, two suggesting that Johnson was disabled and one suggesting that Johnson was still capable of gainful employment, the ALJ was required to credit one opinion over another. The ALJ weighed the relevant medical evidence, and determined that the opinions of Drs. Kothari and Mauthe were not consistent with that evidence, but the opinion of Dr. DiBenedetto was. This conclusion is supported by the medical evidence, and the ALJ did not err in this regard. *See*, *Morales*, 225 F.3d at 317; *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011).

### D.     Residual Functional Capacity Determination

Lastly, Johnson challenges the ALJ's residual functional capacity determination and hypothetical questions posed to the vocational expert. Johnson contends that the ALJ's determination did not properly account for (1) Johnson's inability to sit for extended periods of time, and (2) her limitations in walking and standing.

The medical records do not establish that Johnson had any limitations in her ability to sit for extended periods of time. Three medical doctors, Dr. Bohn, Dr. Ryczak, and Dr. DiBenedetto, opined that Johnson was capable of sitting for six hours during an eight hour workday. Tr. 282, 1005, 1143. Physical examinations of Johnson's back were consistently normal, and her lumbar range of motion was consistently unrestricted. Tr. 695, 709, 734,

23

1002, 1113, 1184. Significantly, no doctor ever opined that Johnson was more limited in her ability to sit than the ALJ determined. *See, Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports [her] allegations that [her] pain and exertional limitations are more severe than the ALJ found them to be.").

However, the ALJ's residual functional capacity determination did not account for any limitations in Johnson's ability to walk or stand; at first blush this omission is troublesome. Dr. DiBenedetto, a physician whose opinion the ALJ accorded "great weight," opined that Johnson was capable of performing sedentary to light work so long as "most of [her] time [was] spent sitting." Tr. 1005. This opinion limits the amount of walking that Johnson was capable of doing during a workday, and the ALJ should have accounted for this limitation. However, to the extent that Johnson's foot impairment would prevent her from standing or walking for more than one-third of the day, the ALJ's failure to account for this issue constitutes harmless error.

During the administrative hearing, the ALJ posed a hypothetical question that limited Johnson to sedentary work. Tr. 463. The vocational expert testified that, with a sedentary work restriction, Johnson would be capable of performing work that exists in significant numbers in the national economy. *Id.* Therefore, although the ALJ did err in not including restrictions relative to Johnson's ability to walk and stand in the residual functional capacity

determination, this error did not affect the outcome of the case and therefore is not a basis

for remand. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner

is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the

Commissioner is affirmed.

An appropriate Order will be entered.


BY THE COURT:


Robert D. Mariani
United States District Judge

Dated: July /8 , 2014